UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                              PLAINTIFF

v.                                                  CRIMINAL ACTION NO. 3:18-CR-2-CRS

Michael D. THOMPSON                                                  DEFENDANT

# MEMORANDUM OPINION

## I.   Introduction

This case is before the Court on Defendant Michael D. Thompson's motion to suppress (DN 14), the report and recommendation of Magistrate Judge Colin H. Lindsay on that motion (DN 23) (the "Report"), and objections filed thereto (DN 26). Finding that the stop of Thompson was not unreasonably extended, the Court will deny the motion to suppress, accept and adopt the Report as supplemented by this opinion, and overrule the objections thereto.

## II.  Factual Background and Procedural History

Thompson makes no objections to the factual findings of the magistrate, concluding that "the basic facts of the encounter in question are summarized accurately." DN 26 at 1. Therefore, the Court adopts and repeats the factual findings of the magistrate in whole.

> At the hearing, the Court heard testimony from one witness, Detective Chris Frisby of the Louisville Metro Police Department's Ninth Mobile Division. (DN 21, #52.) Detective Frisby testified that on September 25, 2017, he and other members of the Ninth Mobile Division were assigned to monitor a funeral home while a service for an alleged local gang member was in progress.[1] (*Id*. at 53.) Around noon, Detective Frisby observed a black Chevy with tinted windows pull into the funeral home's parking lot. (*Id*. at 54.) Thompson was a passenger in the car, and Will Stephenson ("Stephenson") was driving; Detective Frisby knew the two men from previous encounters with them. (Id at 54, 75.) He also noticed that the front window tint on their Chevy was in violation of a Kentucky traffic law because it went "beyond the AS1 line on the top of the window." (*Id*.)
> Thompson and Stephenson were in the funeral home for a "short time." (DN 21, #54.) Immediately after they left the funeral home in the black Chevy, Detective

1

Frisby and his partner, Detective Cundiff, pulled them over for the window tint violation. (*Id*.) Stephenson was driving the vehicle, and Thompson was riding in the front passenger's seat. (*Id*.) Upon approaching Stephenson on the driver's side door, Detective Frisby noticed that he was "nervous, stuttering, [and] shaking." (*Id.* at 55.) Because of Stephenson's behavior, Detective Frisby and the other officers removed him and Thompson from the vehicle. (*Id*.) Thompson and Stephenson consented to a search of their persons, which did not reveal any contraband, but did not give consent to search their vehicle. (*Id*.) While Detective Cundiff waited by the car, Detective Frisby returned to his vehicle to check for warrants, validate the license plate, and call for canine assistance. (*Id*.) He received word that neither Stephenson nor Thompson had any outstanding warrants[2], and he learned from the car was registered to someone named Paul Leach. (*Id*.) After learning that a canine was not available to assist in the stop, Detective Frisby released Thompson, who then walked down the street and back into the funeral home. (*Id*. at 56.)

After Thompson departed, Detective Cundiff informed Detective Frisby that he had smelled marijuana at the driver side door of the vehicle (where Thompson [sic] had been sitting). (DN 21, #56.) Detectives Frisby and Cundiff, along with two other detectives at the scene, proceeded to search the vehicle, finding two firearms in the glove compartment. (*Id*. at 57) Following a check, the detectives learned that both guns had been reported stolen. (*Id*.) Thompson was arrested inside the funeral home and eventually indicted for being a felon in possession of a firearm. (DN 1.)

---

[1] Detective Frisby noted that the Ninth Mobile was assigned to the funeral home "just for surveillance" purposes in case "something happened." (DN 21, #53, 59.)
[2] Detective Frisby had prior knowledge from previous encounters with Stephenson that at the time of the traffic stop, he was on a home incarceration program through state court. (DN 21, #70.) Based on the fact that Stephenson was in violation of his home incarceration program, Detective Frisby would not have been allowed to release him and let him to drive away. (Id. at 71.)

DN 23 at 1–3.

Thompson filed a motion to suppress on March 13, 2018. DN 14. The United States responded. DN 17. On April 18, 2018, this Court referred the motion to the magistrate. DN 18. The magistrate issued his Report on July 25, 2018. DN 23. Thompson, granted additional time (DN 25), filed his objections on August 13, 2018. DN 54. As a result, these matters are ripe for review.

**III.     Legal Standard**

The Court makes a *de novo* determination of the proposed findings or recommendations of the magistrate to which the parties have objected. 28 U.S.C. § 636(b)(1)(C); FED. R. CRIM. P. 59(b)(3). To the extent that no objection is filed, the arguments are waived. *Thomas v. Arn*, 728 F.2d 813, 815 (6th Cir. 1984), *aff'd*, 474 U.S. 140, 147–48 (1985).

**IV.     Discussion**

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST., amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The Supreme Court had a recent opportunity to remind the country of the importance of the Fourth Amendment while expounding on its application to vehicle searches:

> Few protections are as essential to individual liberty as the right to be free from unreasonable searches and seizures. The Framers made that right explicit in the Bill of Rights following their experience with the indignities and invasions of privacy wrought by "general warrants and warrantless searches that had so alienated the colonists and had helped speed the movement for independence." *Chimel v. California*, 395 U.S. 752, 761, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969). Ever mindful of the Fourth Amendment and its history, the Court has viewed with disfavor practices that permit "police officers unbridled discretion to rummage at will among a person's private effects." *Arizona v. Gant*, 556 U.S. 332, 345, 129 S. Ct. 1710, 173 L.Ed.2d 485 (2009).
> This concern attends the search of an automobile. *See Delaware v. Prouse*, 440 U.S. 648, 662, 99 S. Ct. 1391, 59 L.Ed.2d 660 (1979). The Court has acknowledged, however, that there is a diminished expectation of privacy in automobiles, which often permits officers to dispense with obtaining a warrant before conducting a lawful search. *See, e.g., California v. Acevedo*, 500 U.S. 565, 579, 111 S. Ct. 1982, 114 L.Ed.2d 619 (1991).

*Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018).

Here, the United States had no objections to the Report.[1] Thompson objects only to the Report's conclusion that the traffic stop was not prolonged beyond the time reasonably required to complete the mission of the stop. DN 26 at 2. His argument is that the window tinting violation and identity of the occupants were immediately apparent upon their arrival at the funeral home. *Id*. at 1. Despite that, the officers, instead of citing them for the violation, running the license plate, or checking for warrants while they were inside the funeral home, waited until the occupants reentered the vehicle and began driving away to stop them. *Id*. at 2.

For this proposition, Thompson cites *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). There, the Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 1612. A "seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)) (alterations in original).

In *Rodriguez*, the officer stopped a car for veering onto the shoulder—a traffic violation in Nebraska. *Id.* at 1612. The officer gathered Rodriguez's driver's license, registration, and proof of insurance before returning to his cruiser. *Id.* at 1613. There, he ran a records check, began writing a ticket for driving on the shoulder, and called another officer for backup. *Id.* He returned to the car, explained the written warning citation, and gave Rodriguez back his

---

[1] The United States does not object to the magistrate's finding that Thompson had standing to contest the stop of the vehicle and that the search was a result of that stop. Regardless, the Court thinks this determination correct, even on *de novo* review. *See United States v. Torres-Ramos*, 536 F.3d 542, 549 (6th Cir. 2008) (explaining that a passenger "may still challenge the stop and detention and argue that the evidence should be suppressed as fruits of illegal activity.") (citing e.g. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). Similarly, Thompson does not object to the magistrate's finding that he lacked standing to contest the search of the vehicle. The Court also thinks this determination correct, even on *de novo* review. *See Byrd*, 138 S. Ct. at 1527–30 (discussing the reasonable expectation of privacy of a non-owner in a car); *Rakas v. Illinois*, 439 U.S. 128, 148 (1978) (mere passengers in a car, without more, lack reasonable expectation of privacy in glovebox).

4

documents. *Id.* Nevertheless, the officer requested permission to walk a drug-sniffing dog around the vehicle, which was denied. *Id.* At that point, the officer instructed Rodriguez to turn off the ignition and exit the vehicle. *Id.* After backup arrived, the officer walked the drug dog around the vehicle, where the dog alerted to the presence of drugs. *Id.* A search of the vehicle revealed methamphetamine. *Id.*

Defendant argues, like Rodriguez, that his stop was unreasonably extended. However, on this point, Rodriguez is inapposite. The stop of Defendant could not be extended by the officers' failure to investigate the car while they were inside because the stop had not yet begun. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation."). What has not yet begun cannot, by definition, be extended. The Court simply finds no support in the law that an officer must immediately begin investigating any potential traffic violation. Further, in this case, the period of extension that Thompson complains of was somewhere between two and five minutes. DN 21 at 14:10–11. Such a minute amount of time certainly does not make the uninitiated stop unreasonable.

Thompson, in his motion to suppress, argues that the stop was "under the pretext of improper window tinting." DN 14 at 2. It is certainly possible that the officers desired to search for other evidence of wrongdoing. They were observing the funeral of a known Victory Park Crips member who had recently been shot while standing outside his home. DN 21 at 13:11–17. They knew both Stephenson and Thompson from prior run-ins with the law. DN 21 at 8:8–11, 29:1–8. Perhaps they anticipated that they would find evidence of other crimes in the truck—either guns or drugs, or both. They even went so far as to call for a drug dog during the stop,

5

despite the fact that they lacked reasonable suspicion to do so.[2] However, as is often noted in these cases, the motives of the officers are irrelevant. *Whren v. United States*, 517 U.S. 806, 813 (1996). All that is required is probable cause to stop the car and cite the driver for a traffic violation. In this case, that violation was of the laws of the Commonwealth of Kentucky and was apparent to the officers.

**V.     Conclusion**

The stop of Thompson was not unreasonably extended. Further, he lacks standing to challenge the continued stop of Stephenson or the search of the vehicle. Therefore, the Court, being sufficiently advised, will deny the motion to suppress, accept and adopt the Report as supplemented by this opinion, and overrule the objections thereto.

A separate order will be entered in accordance with this opinion.

October 29, 2018

**Charles R. Simpson III, Senior Judge**
**United States District Court**

---

[2] At the magistrate's evidentiary hearing, Detective Frisby testified that he did not have any reasonable suspicion of marijuana when he called for the drug-sniffing dog:
> At that point Detective Cundiff had not relayed to me personally that he had smelled the odor of marijuana, so that is – even though sometimes we have PC when we smell the odor, we still sometimes call for canine to do a search because a lot of cars will have hidden compartments. They stash – people stash – hide stuff in the vehicles, so a canine will help us or assist us in finding those. . . . I did not smell the odor.

DN 21 at 20:13–19, 20:25.

Calling a drug-sniffing dog during a routine traffic stop when the officer does not have reasonable suspicion of the presence of illegal drugs, thereby extending the search beyond the initial reasons for the stop, is an unreasonable seizure under *Rodriguez*. *United States v. Warfield*, 727 F. App'x 182, 188–89 (6th Cir. 2018). Simply put, calling a drug dog, whose "only function is to search for illegal drugs" when the officer knows of no evidence of illegal drugs "makes this seem less like an investigation . . . and more like a fishing expedition" *Id.* at 189. That case is different from one where the officer calling the drug-sniffing dog has smelled marijuana or has been informed that another officer smelled marijuana, *United States v. Cissell*, 5:16-CR-4-TBR, 2016 WL 4577037 at *3 (W.D. Ky. Aug. 31, 2016), or where officers utilize a drug-sniffing dog—even without reasonable suspicion—*while* undertaking the activities normally incident to the traffic stop, so long as the dog's sniff is completed within the time it takes to conduct a normal traffic stop. *See United States v. Miles*, 3:17-CR-100-CRS, 2018 WL 1903579 at *2 (W.D. Ky. April 20, 2018); *United States v. Brewer*, 3:17-CR-37-DJH, 2018 WL 616145 at *3 (W.D. Ky. Jan. 29, 2018). Here, the dog never arrived. As a result, under these facts, there was no extension of the search. However, if the facts of our case differed only slightly, i.e. the drug-sniffing dog had arrived, that conclusion might not stand.

6